FILED
2011 Sep-30  AM 10:50
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION**

| | |
|---|---|
| **ROBERT QUINN,** | ] |
| **Plaintiff,** | ] |
| **v.** | ]          **CV-09-BE-2403-E** |
| **QWEST COMMUNICATIONS CORPORATION,** *a corporation*, **et. al.** | ] |
| **Defendants.** | ] |

**MEMORANDUM OPINION**

This ERISA long-term disability benefits matter comes before the court on Plaintiff

Robert Quinn's Motion for Judgment as a Matter of Law (doc. 30). The court set the case for

final submission, without oral argument, by order dated June 16, 2010 (doc. 24). Accordingly,

the court will review the parties' submissions as the trier of fact and reach a final decision on the

merits based on the record presented by the parties.

**I.      Introduction**

Mr. Quinn worked for Qwest in Phoenix, Arizona, when he injured his back and

underwent multiple surgeries. Mr. Quinn was diagnosed with failed back syndrome, lumbago and

sciatica, and psychological symptoms resulting from the injury. At the time of his injury, Mr.

Quinn was covered by an ERISA disability plan, and received benefits from 2001 to 2007.

During the 2007 review of Mr. Quinn's benefits, Defendants required additional independent

medical evaluations and a functional capacity evaluation. The Defendants denied Mr. Quinn's

continued benefits and Mr. Quinn appealed the denial of benefits. As part of the appeals process,

Defendants requested that Mr. Quinn undergo another round of independent medical evaluation

and functional capacity evaluations in Atlanta; however, Mr. Quinn refused to undergo the evaluations. Defendants, based in part on the evidence supporting the initial denial and on Mr. Quinn's refusal to provide them with more medical evidence on appeal, denied his benefits again on appeal.

Mr. Quinn seeks judgment in his favor on the claim that Defendants Qwest Communications Corporation, Qwest Disability Services, Qwest Disability Plan, Qwest Employee Benefits Committee, and Quest Communications International, (hereinafter collectively "Qwest") wrongfully terminated his long-term disability benefits and that he is entitled to those benefits. Qwest argues that its decision to terminate Mr. Quinn's benefits was correct based on Mr. Quinn's cumulative medical record and independent evaluations conducted shortly before it terminated Mr. Quinn's benefits, along with Mr. Quinn's refusal to participate in further evaluations on appeal.

The court has carefully considered the parties' arguments and evidentiary submissions, the Administrative Record, and the applicable law.  For the reasons stated below, the court finds that Mr. Quinn's Motion for Judgment as a Matter of Law is due to be denied.

## II.    Statement of Facts

### A.  Introduction and Plan Provisions

Mr. Quinn is a former employee of Qwest Corporation where he was covered under an ERISA-governed employee welfare benefit plan. Qwest Communications International, Inc. funds the plan. Under the plan, Qwest Communications International – the Plan Sponsor and Plan Administrator – has authority to appoint a third-party administrator ("TPA") to administer the plan and grants the plan administrator (or delegatee) broad discretionary authority to

determine eligibility for benefits and to construe the terms of the plan. From April 2004 through the filing date of the briefs, Qwest had contracted with Reed Group Ltd. to act as the TPA.

Under the plan, participants have to show, by objective medical documentation, that they are unable to perform their last Company-assigned job during the first twelve months they receive long-term disability ("LTD") benefits. Participants who receive more than twelve months of LTD benefits are entitled to continuing benefits only if they meet the standard for "Disability" under the plan. Participants meet this standard if they either: (a) are unable to engage in any job, and this inability is supported by objective medical documentation, or (b) are unable to engage in any job for which they may reasonably become qualified, other than a job that pays less than 60% of their base pay at the time their employment ended.

The plan also requires participants receiving benefits to take some action to continue receiving benefits. Participants must seek proper care and treatment from an approved provider, follow a recommended treatment plan, and provide documentation supporting "Disability" upon request. Participants must also report "for medical or psychological examinations from time to time at the request of the TPA or Plan Administrator for the purpose of determining the participant's condition."(A.R. at 1694).[1]

B.  *Mr. Quinn's Injury, Application for Disability Benefits, and Medical History to 2007*

While Qwest employed him, Mr. Quinn worked in Phoenix, Arizona as a Customer Service Technician, a job rated as "heavy" in terms of physical exertion. On September 23, 2001, Mr. Quinn injured his back at work while lifting a manhole cover. He was diagnosed with failed back syndrome, lumbago and sciatica, adjustment disorder with mixed emotions, mood disorder

---

[1] Citations to the administrative records (doc. 16) are indicated with "A.R." followed by the page number.

3

with depressive features, and anxiety disorder.

Because of his injury, Mr. Quinn required multiple surgeries. Dr. Khayata initially treated Mr. Quinn for his back pain and performed Mr. Quinn's first back surgery on October 20, 2001. After this surgery, Mr. Quinn continued to experience back pain, and during 2002  Dr. Kreiner and Dr. Winer treated him. Dr. Winer performed Mr. Quinn's second back surgery on June 15, 2002.  When Mr. Quinn continued to experience pain, Dr. Winer referred him to Dr. Michael McCauley, who installed the Medtronic drug delivery system ("pain pump") to deliver narcotic painkillers.

Although Dr. Winer diagnosed Mr. Quinn with multiple injuries to his spine, he noted that Mr. Quinn's level of activity was not appropriate for his rehabilitation process, explaining that Mr. Quinn should be participating in physical therapy rather than spending his days on the couch. Dr. Winer concluded that "[Mr. Quinn's] degree of impairment appears to be out of proportion to the objective findings." (A.R. at 1197).  Although Dr. Winer said he felt the back surgery was justified, he noted that "[Mr. Quinn] continues to have severe disabling complaints" despite Dr. Winer's belief that the surgery had come out well. (A.R. at 1197).

Mr. Quinn applied for short-term disability (STD) benefits for an on-the-job injury, which he received for 52 weeks through September 30, 2002. He also began receiving workers' compensation benefits after his injury. On September 30, 2003, after the period for STD benefits ended, Mr. Quinn was discharged from his employment under the terms of the plan and became entitled to LTD benefits.

Dr. McCauley also encountered difficulties in treating Mr. Quinn, and refused to continue treating him as of December 29, 2003 because of his refusal to cooperate with care. Specifically, Dr. McCauley noted that Mr. Quinn was "manipulative and sociopathic." (A.R. at 1365–66).

The previous TPA reviewed Mr. Quinn's benefit entitlement on a yearly basis and approved him for LTD benefits for twelve month periods each September from 2002 through 2004. From 2004 on, Reed took over as the TPA and approved Mr. Quinn for benefits on September 30, 2004, and September 30, 2005. When approving Mr. Quinn for LTD benefits in 2004, Reed noted that Mr. Quinn's condition had not improved, that he continued to use his pain pump, that he required assistance with his activities of daily living, that he walked with a distorted gait and sometimes used a rolling walker, and that he was not gainfully employable. Reed approved Mr. Quinn's 2005-2006 application under a similar rationale.

During this time, Dr. Porter and Dr. Kalyanam continued to treat Mr. Quinn for refills of his Medtronic pump. Dr. Porter's initial evaluation noted that Mr. Quinn experienced ongoing severe pain, paresthesia, presis, and dysesthesia in his low back and lower extremities. He noted that Mr. Quinn's mobility was impaired as were his activities of daily living, and stated that Mr. Quinn "[cannot] work and probably will not be able to work in the future." (A.R. at 537). Dr. Roden, a psychologist, also treated Mr. Quinn during 2004 and 2005. After Mr. Quinn moved to Alabama in 2005, Dr. Roden provided counseling by phone through 2007.

In 2006, Dr. Gary Dilla performed an independent medical evaluation ("IME") of Mr. Quinn in Arizona as part of the worker's compensation process. Dr. Dilla, who received scarce medical records for the evaluation, determined that Mr. Quinn indeed had failed back syndrome based primarily on his physical evaluation of Mr. Quinn and Mr. Quinn's subjective complaints;

however, Dr. Dilla explained that Mr. Quinn's degree of self-limitation was excessive given the diagnosis. Dr. Dilla concluded that Mr. Quinn's prognosis for a successful return to work was poor and that he would be limited to a sedentary job.

The Doleys Clinic began treating Mr. Quinn in early 2006, after his move to Alabama. Dr. Doleys conducted the initial examination, from which he diagnosed Mr. Quinn with persistent pain and other back problems, including failed back syndrome. Dr. Doleys also conducted a psychometric test, the MMPI-II, to obtain a picture of the psychological aspects of Mr. Quinn's condition. Dr. Doleys found no indication that Mr. Quinn was "intentionally or consciously" misrepresenting his situation, but further found that he merely had tendencies to be "somatically hyperaroused and focused" and that he "may have been somewhat defensive in his response pattern." (A.R. at 716). Based on his initial examination of Mr. Quinn, Dr. Doleys admitted Mr. Quinn into the Doleys Clinic, and Dr. Lisa Columbia of the clinic began treatment. Dr. Columbia had Mr. Quinn undergo an MRI, where she noted no significant abnormality, and refilled his pain pump.

In 2006, Mr. Quinn's sources of income for his disability benefits changed in amount and composition. From September 20, 2002 through October of 2006, Mr. Quinn's disability benefits were offset 100% by his social security disability benefits and workers' compensation benefits. In 2006, his workers' compensation claim was settled with a lump sum payment of $150,000 and monthly benefits of $488.63. After the settlement, Qwest delayed in paying Mr. Quinn his LTD benefits while Qwest determined how the settlement changed the offset of the benefits. Qwest did not begin paying Mr. Quinn his monthly LTD benefits until June 5, 2007, when it informed

Mr. Quinn that he would receive monthly LTD benefits of $911.08 so that, combined with his workers' compensation and social security benefits, his total monthly benefit equaled $2,715.71.

When Reed sought to review Mr. Quinn's claim in 2006, Reed requested information from Dr. Roden, Mr. Quinn's psychologist at the time, who replied that he was not qualified to provide input on Mr. Quinn's medical condition or chronic pain. Reed also requested information from one of Mr. Quinn's physicians in 2006, Dr. Sailsbury. Dr. Sailsbury opined that Mr. Quinn was permanently and totally disabled and supported the continuation of benefits. When Reed sought to obtain a functional capacity evaluation ("FCE") to evaluate Mr. Quinn's physical abilities, Mr. Quinn objected. Dr. Sailsbury concurred in the objection, notifying Reed that the FCE was an unnecessary hardship that would not change Mr. Quinn's treatment. Reed did not pursue this issue and continued LTD benefits through September, 2007.

Dr. Sailsbury left Southeastern Pain Management in 2007, and Dr. Muratta continued treatment through 2007. Dr. Muratta released Mr. Quinn from treatment in November, 2007 when Mr. Quinn refused a urine test required for continued prescription of narcotic medication.[2] Throughout 2007, Dr. Roden continued to provide psychological counseling to Mr. Quinn by phone.

## C.  Reed's Decision to Discontinue Benefits

In July, 2007, Reed began the annual review process for the period following September, 2007. Reed requested objective medical documentation of Mr. Quinn's disability from Dr. Roden and from Southeastern Pain Management. Dr. Roden responded that he could not offer an opinion on Mr. Quinn's disability because Mr. Quinn's disability was not psychological, but

---

[2] In later examinations, Mr. Quinn explained that he refused the urine test because he would have had to pay for it out of pocket. He explained he would only undergo the drug screen if workers' compensation covered the expense.

instead physical. Dr. Muratta also responded that he could not offer an opinion on whether Mr.

Quinn was disabled because an FCE was needed to determine whether Mr. Quinn was so

functionally limited that he could still not return to work. Dr. Muratta's response put Reed on

notice of a possible lack of objective documentation regarding Mr. Quinn's disabilities. On

November 7, 2007, Reed internally reviewed the records Southeastern Pain Management sent to

it and determined that the records did not reveal objective medical documentation of Mr. Quinn's

disabilities.

Reed thus scheduled Mr. Quinn for an IME with Dr. Terry Andrade, a neurosurgeon, and  Dr. Gil

Maddox, a doctor board certified in pain management and anesthesiology. Dr. Andrade examined

Mr. Quinn on November 29, 2007, and, like Dr. Winer and Dr. McCauley, noted that Mr. Quinn

disproportionately magnified his symptoms respective to his injuries and that Mr. Quinn's

limitations resulted more from his own lack of motivation than actual physical limitations. He

stated the following work restrictions: "no frequent lifting over 20 pounds; no maximum lifting

over 30 pounds; may stoop/bend/twist; and alternate sitting and standing sit 50 min/ per hour and

stand 10 min/ per hour." (A.R. at 776). Dr. Andrade concluded that Mr. Quinn could return to

work subject to these conditions, and should also participate in a progressive exercise program.

Dr. Maddox, who examined Mr. Quinn on January 3, 2008, reached similar conclusions.

Noting the previous comments by Dr. Winer and Dr. McCauley, Dr. Maddox found "ample

reason to be concerned about what this patient's limitations actually are" and recommended a

two-day FCE and an independent psychiatric evaluation. (A.R. at 767). In a separate letter, Dr.

Maddox referenced surveillance DVDs that indicated that Mr. Quinn could walk and drive

without assistance[3] and also referenced Dr. Dilla's observations that Mr. Quinn's complaints were in excess of what one would expect for a patient who underwent failed back surgery.

Because of Dr. Maddox's recommendation, Reed faxed a letter to Dr. Muratta on March 18, 2008, asking for his concurrence for Mr. Quinn to undergo an FCE; Dr. Muratta signed the attached form and returned it to Reed with his concurrence.

Although Dr. Sailsbury had left Southeastern Pain Management in early 2007, Mr. Quinn began seeing him again in early 2008, following his discharge from Dr. Muratta's office for refusing the urine test. Dr. Sailsbury faxed a letter to Reed on March 31, 2008, again stating his belief that Mr. Quinn should not undergo an FCE because of the severity of his back problems. Reed responded that because Dr. Muratta had approved Mr. Quinn to attend the FCE and because Dr. Muratta had treated him in the prior year, Reed would require Mr. Quinn to attend the FCE. Reed then scheduled an independent psychological examination with Dr. Lucille Bodenheimer and a separate two-day FCE.

The FCE, conducted on April 2, 2008, reported that the evaluators could only complete six out of thirty-six tests. Because of the scarcity of information, the evaluators could not determine Mr. Quinn's overall level of work tolerance. Qwest attributes Mr. Quinn's inability to finish the test to his own self-limiting behavior, while Mr. Quinn claims he was unable to finish because of the pain the FCE caused him.

Shortly after the April 2 FCE, Kelly Quinn, Mr. Quinn's wife, called Reed to inform it that Mr. Quinn had gone to the emergency room; however, the Administrative Record contains no documentation of Mr. Quinn's visit to the emergency room. In the call, Ms. Quinn explained

---

[3] Neither the administrative record nor the parties' briefs make any other reference to the surveillance DVDs and they were not included in the evidentiary submissions.

that the FCEs had caused Mr. Quinn severe pain and questioned Reed as to why they required

Mr. Quinn to attend the FCE when Dr. Sailsbury had informed them that Mr. Quinn was not

capable. Reed responded that Dr. Muratta, who had been treating Mr. Quinn through 2007, had

signed a form concurring that Mr. Quinn should attend the FCE. Although the FCE was

scheduled to last two days, the record does not reflect that the FCE was conducted on any day

besides April 2.

Meanwhile, Dr. Bodenheimer examined Mr. Quinn over the course of three visits during

March and April of 2008. In her detailed report, among other things, she whether Mr. Quinn was

exaggerating his symptoms. She also questioned whether the telephone sessions Mr. Quinn had

with Dr. Roden were effective. Dr. Bodenheimer recommended in her report that Mr. Quinn go

to a pain management clinic so that a psychologist on staff could evaluate how much of Mr.

Quinn's pain was valid versus how much might be related to malingering. She also thought that a

specialized pain management clinic could help him obtain relief so that he could engage in more

physical activities, even with his current limitations.

While Dr. Andrade's and Dr. Maddox's IME spurred Reed to send Mr. Quinn in for a

FCE, Reed also sent the IME results to a third party to obtain a transferrable skills analysis

("TSA") to determine whether Mr. Quinn was employable in the Anniston/Oxford area given his

education, skills, and work restrictions. The TSA also included a "Medical Summary" based on a

few sentences from the recently conducted IMEs.[4] The TSA concluded that Mr. Quinn could

---

[4] The Medical Summary is reproduced here:

> Mr. Quinn has several medical diagnoses: Post laminectomy syndrome of lumbar region, lumbago and sciatica, adjustment disorder with mixed emotions, mood disorder with depressive features, anxiety disorder.

> Per Dr. Tony Andrade, "No frequent lifting over 20 pounds, no maximum lifting over 30 pounds, may stoop./bend/twist [sic] and alternate sitting and standing - sit 50 minutes per hour and stand 10

perform the available jobs of Sales Representative, Telephone/Television Services, or Telephone

operator in the light and sedentary categories, and that these jobs would provide a rate of pay

greater than 60% of Mr. Quinn's final Qwest Corporation salary. The TSA also concluded,

however, that Mr. Quinn "may have a difficult time obtaining such a job." (A.R. at 135).

  With the IME, FCE, Dr. Bodenheimer's evaluation, and the TSA in hand, Qwest

Disability Services ("QDS") sent Mr. Quinn a letter on July 10, 2008, explaining that QDS was

going to deny his benefits. The letter outlined QDS's efforts in obtaining objective medical

documentation from Southeastern Pain Management, including Dr. Muratta's statement that he

had discharged Mr. Quinn for his refusal to take a urine test and Dr. Muratta's explanation that

an FCE was needed to determine whether Mr. Quinn was truly disabled. QDS also referenced

both IMEs with Dr. Andrade and Dr. Maddox, Dr. Bodenheimer's evaluation, and the results of

the TSA. The letter explained that because all the information gathered showed that Mr. Quinn

could maintain another job, QDS was denying his benefits. The letter concluded with the

procedure for appealing QDS's decision.

### D.  Mr. Quinn's Appeal and Qwest's Denial

  On July 16, 2008, Mr. Quinn notified Reed of his intent to appeal and requested a copy

of the medical records received by Reed from January, 2007 through July, 2008. Reed notified

---

minutes per hour...above limitations are more based on motivation of patient rather than physical limitations."

Per Dr. Lucille Bodenheimer, Psy. D., "It would have to be sedentary work...it appears that Mr. Quinn reads at a lower grade level, furthermore, he has difficulty recalling things that he hears. Therefore any type of work that he does, in addition to being sedentary, would have to require a low education level". [*sic*]

Per the Physical Work Performance Evaluation, "Due to the incomplete nature of the testing and overall level of work could not be determined". [*sic*]

For the purpose of this report, only sedentary occupations not requiring more than a High School Diploma will be considered.

Mr. Quinn of all medical records that it intended to provide to the Appeal Board, and notified

Mr. Quinn that he had the right to provide additional information by August 5, 2008 to the

Appeals Board and that he could request a forty-five day extension if he needed more time to

submit information.

A week later, Ms. Quinn, spoke with Reed's Appeals Specialist on July 23, 2008 and

indicated that the Quinns had retained an attorney and that Mr. Quinn did not need any more

documents at that time. On July 31, 2008, Reed granted Mr. Quinn an additional forty-five days

to submit records for the appeal, through September 17, 2008.

In support of Mr. Quinn's appeal, Cary Kirby, Mr. Quinn's attorney, sent Reed a letter on

September 16, 2008. Mr. Kirby's letter included statements from Dr. Sailsbury and Dr. Roden

indicating that Mr. Quinn was totally disabled and unable to do any work. Dr. Sailsbury, who had

left Southeastern Pain Management in 2007, stated that he had resumed treatment of Mr. Quinn

in February of 2008 and that he did not believe Mr. Quinn could ever hold gainful employment.

On September 29, 2008, the Appeals Specialist notified Mr. Quinn that Reed was

exercising its right under the plan to take an additional forty-five day extension of time to

complete the record for appeal to obtain additional medical and psychological evaluations, and

that, therefore, the deadline for submitting information was October 31, 2008.

Reed decided, based on the information in the file, including Dr. Bodenheimer's

recommendation, that Mr. Quinn should see a psychologist associated with a pain management

clinic and also should attend an IME with a pain management specialist. But when Reed tried to

contact the clinic Dr. Bodenheimer had recommended in her independent psychiatric evaluation,

the clinic informed Reed that they did not perform IMEs.

Reed then selected providers in Atlanta, Georgia, to perform the examinations. On September 29 and 30, 2008, Reed and its service provider for logistics for the IMEs, the Exam Coordinators Network ("ECN"), informed Mr. Quinn and his counsel by letter of the dates and times of the IMEs. The IMEs were scheduled for October 13, October 14, and October 22, 2008. The letters informed Mr. Quinn and his counsel that ECN had arranged transportation, food, and lodging, which Qwest would provide at no cost to Mr. Quinn. The letters also informed Mr. Quinn that his participation in the IMEs was mandatory under the plan and that if he failed to attend his benefits would remain denied.

Mr. Kirby responded to the letters by calling Reed on October 7, 2008, and expressing concern over Mr. Quinn's ability to sit in a car for a two hour trip to the IME. Reed's Appeals Specialist informed Mr. Kirby that the distance was necessary because Mr. Quinn lived in a "remote area" (Anniston-Oxford area) and because of the specialty testing required. The Appeals Specialist also explained that the ECN could accommodate Mr. Quinn's needs by allowing him to recline or lie down on the ride to Atlanta and allowing him as much time for breaks as needed. The ECN sent a fax to Mr. Kirby on October 9, 2008, confirming the details of the IME appointments and indicating that a van would pick up Mr. Quinn at his home on Sunday, October 12, 2008.

Mr. Kirby faxed a letter to the Appeals Coordinator on Friday, October 10, explaining that Mr. Quinn refused to attend the IMEs. The parties dispute whether Mr. Kirby sent the letter before the close of business on Friday. Although the timestamp at the bottom of the fax indicates Reed received the faxed at 3:11 PM, Mountain Time, Reed claims it did not receive notice of Mr. Quinn's refusal to participate until Monday, October 13, after the ECN had already dispatched

the van to Mr. Quinn's house on Sunday. Mr. Kirby's letter did not provide an explanation for

the cancellation nor did it offer to reschedule the IMEs.

In the same letter, Mr. Kirby requested that Reed send him all pertinent documents and

suspend the appeal indefinitely so he could review the pertinent documents. Reed provided Mr.

Kirby with a copy of the claim file, which exceeded 1,500 pages, on November 18, 2008;

however, Reed denied his request for an indefinite extension.

Almost a week later, on November 26, 2008, the Appeals Board issued its decision

denying Mr. Quinn's appeal of the denial of his LTD benefits claim. Reed explained in its letter

that it denied Mr. Quinn's appeal based on the prior IMEs, FCE, and TSA, and based on Mr.

Quinn's refusal to participate in the October, 2008 psychological and medical IMEs.

## III.    Standard of Review

Courts have recognized that the summary judgment standard is not appropriate in ERISA

cases where "the district court sits more as an appellate tribunal than as a trial court." *Curran v.

Kemper Nat. Servs. Inc.*, 133 Fed. Appx. 740, 2005 WL 894840, at *7 (11th Cir. 2005) (quoting

*Leahy v. Raytheon Co.*, 315 F.3d 11, 17–18 (1st Cir. 2002)); *see Ruple v. Hartford Life &

Accident Ins. Co.*, 340 Fed. Appx. 604, 611 (11th Cir. 2009) ("[The] typical summary judgment

analysis does not apply to ERISA cases"); *Herman v. Hartford Life & Accident Ins. Co.*, 2011

U.S. Dist. LEXIS 87818, at *3 (S.D. Fla. Aug. 9, 2011). In this case, Mr. Quinn filed motions for

judgment as a matter of law. *See Blankenship v. Metro. Life Ins. Co.*, 644 F.3d 1350, 1354 n.4

(11th Cir. 2011) (explaining that the parties in that case had termed their motions as "motion[s]

for judgment as a matter of law," and that the parties and district court then treated the motions

as "vehicles for resolving conclusively – in the light of the record before the plan administrator –

the question of the reasonableness of administrative determinations in [the] case."). Thus, when resolving this motion, the court does not take evidence on any unresolved factual issues, such as whether Mr. Quinn is truly disabled, but instead evaluates whether the plan administrator was reasonable in its decision to deny benefits.

The ERISA statute, however, does not provide a standard of review for actions brought under § 1132(a)(1)(B) challenging benefit eligibility determinations. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109, 109 S. Ct. 948, 953 (1989). The Supreme Court in *Firestone* established three distinct standards for reviewing an ERISA plan administrator's decision: (1) *de novo* where the plan does not grant the administrator discretion; (2) arbitrary and capricious where the plan grants the administrator discretion; and (3) heightened arbitrary and capricious where the plan grants the administrator discretion *and* the administrator has a conflict of interest. *Capone v. Aetna Life Ins. Co.*, 592 F.3d 1189, 1195 (11th Cir. 2010) (discussing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S. Ct. 948 (1989)).

The Eleventh Circuit further fleshed out the *Firestone* test into a six-step framework to guide courts evaluating a plan administrator's decision. *See Williams v. Bellsouth Telecomms., Inc.*, 373 F.3d 1132, 1137 (11th Cir. 2004), *overruled on other grounds by Doyle v. Liberty Life Assurance Co. of Boston*, 542 F.3d 1352 (11th Cir. 2008).

When the Eleventh Circuit first created the *Williams* test, the sixth step of the test required courts reviewing a plan administrator's decision to apply a heightened arbitrary and capricious standard if the plan administrator operated under a conflict of interest. *See id.* The Eleventh Circuit later modified this step in response to the Supreme Court's ruling in *Metropolitan Life Insurance Company v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343 (2008) making

15

the conflict of interest a factor in the analysis rather than having it trigger a heightened standard

arbitrary and capricious standard. *See Blankenship*, 644 F.3d at 1354–55 (citing *Williams v.*

*Bellsouth Telecomms.*, *Inc.*, 373 F.3d 1132, 1137–38 (11th Cir. 2004)).

The Eleventh Circuit's latest version of the *Williams* test provides:

> (1) Apply the de novo standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (i.e., the court
> disagrees with the administrator's decision); if it is not, then end
> the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then
> determine whether he was vested with discretion in reviewing
> claims; if not, end judicial inquiry and reverse the decision.
> (3) If the administrator's decision is "de novo wrong" and he was
> vested with discretion in reviewing claims, then determine whether
> "reasonable" grounds supported it (hence, review his decision
> under the more deferential arbitrary and capricious standard).
> (4) If no reasonable grounds exist, then end the inquiry and reverse
> the administrator's decision; if reasonable grounds do exist, then
> determine if he operated under a conflict of interest.
> (5) If there is no conflict, then end the inquiry and affirm the decision.
> (6) If there is a conflict, the conflict should merely be a factor for
> the court to take into account when determining whether an
> administrator's decision was arbitrary and capricious.

*Blankenship*, 644 F.3d at 1354–54.

Because the plan covering Mr. Quinn grants the plan administrator, or its delegatees, full

discretion in reviewing claims under the plan, all steps in the *Williams* test are *potentially* at

issue. *See Blankenship*, 644 F.3d at 1356 n.7. Although Mr. Quinn never explicitly asserted a

conflict of interest, *see* Pl. Br. (Doc. 31) at 20 ("Here, we do not believe any reasonable grounds

existed to support Qwest's adverse determination, so whether Qwest had a conflict of interest is

irrelevant."), he insinuated that Qwest was conflicted in his initial brief, arguing that when Mr.

Quinn's workers' compensation no longer completely offset his LTD benefits, "the change in

Qwest's attitude toward Mr. Quinn was significant," *see* Pl. Br. (doc. 31) at 15.

16

Qwest responded to Mr. Quinn's insinuation by pointing out that it was self-insured for work-related injuries and responsible for costs related to both Mr. Quinn's worker's compensation benefits and his LTD benefits. And because Reed – not Qwest – was responsible for denying Mr. Quinn's benefits, and because Reed otherwise did not receive financial benefits from denying claims, Qwest asserts that no conflict of interest existed.

Mr. Quinn never responded to Qwest's assertions regarding the conflict, even though he had the opportunity to reply. As explained further below, this court thus did not take into account the conflict as a factor when determining whether Reed was arbitrary and capricious in denying Mr. Quinn's benefits.

## IV.   Discussion

### A.  De novo review

The first step outlined in the *Williams* test is to determine whether the claim administrator's denial of benefits is wrong under the *de novo* standard. Some courts assume that the administrator's decision is *de novo* wrong without analyzing the facts, *see*, *e.g.*, *Pinto v. Aetna Life Ins. Co.*, 2011 U.S. Dist. LEXIS 16961, at *26 (M.D. Fla. Feb. 145, 2011). Although this analysis appears to render the first step of the *Williams* test superfluous, the Eleventh Circuit itself has been inconsistent in how it treats this first step when reviewing ERISA cases on appeal. *Compare Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1246–47 (11th Cir. 2008) (upholding the district court's application of the *de novo* standard finding the plan administrator was right and then concluding itself that the plan administrator was right under that same standard) *with Blankenship*, 644 F.3d at 1356 (skipping straight to the third step of the *Williams* test and explaining in footnote 7 that all steps of the *Williams* test were at issue because the plan

17

administrator undisputedly had discretion under the plan).[5]

When reviewing the administrator's decision *de novo*, the court is limited to the material that was before Reed at the time it made the decision to deny benefits. *See Glazer v. Reliance Std. Ins. Co.*, 524 F.3d at 1246 (explaining that a court performing a de novo review is "limited to the record that was before [the administrator] when it made its decision"). Because courts are limited to this material in their review, this court does not seek to answer whether Reed's decision to deny benefits was absolutely correct or attempt to resolve factual disputes. *See Pinto*, 2011 U.S. Dist. LEXIS 16961, at *25 ("There may be indeed be unresolved factual issues evident in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would."); *see also Blankenship*, 644 F.3d at 1357 ("We decide nothing today about whether the plan administrator's decisions were absolutely correct in reality. They may possibly not have been.").

As Judge Acker points out in his underlying *Blankenship* opinion, this standard of review poses a challenge to a court seeking to review a claim administrator's decision under <u>any</u> standard. *See Blankenship*, No. 2:08-CV-00639-WMA, slip op. at 11 ("This court knows from experience that, under ERISA, trial courts, despite never having seen a live witness, routinely make, or purport to make, credibility determinations to resolve disputes between irreconcilable unsworn written testimony."). This critique is especially pointed when applied to *de novo* review,

---

[5] The district court's heavy reliance on conflict of interest as a factor in reversing the denial of benefits may explain the inconsistency between these two cases. *See Blankenship v. Metro. Life Ins. Co.*, No. 2:08-CV-00639-WMA, Doc. 50, slip op. at 11–27 (N.D. Ala. Dec. 30, 2009). In Judge Acker's district court opinion, he noted that the Supreme Court's *Glenn* opinion held that the conflict of interest could be a factor but did not explain how to weigh it. *Id.* at 15. Judge Acker then thoroughly analyzed the conflict of interest and found it helped show Met Life's decision was arbitrary and capricious. *Id.* at 15–27. The Eleventh Circuit reversed Judge Acker's decision, explaining that "[t]he presence of a structural conflict of interest – an unremarkable fact in today's marketplace – constitutes no license, in itself, for a court to enforce its own preferred de novo ruling about a benefits decision." *See Blankenship*, 644 F.3d at 1356. For the Eleventh Circuit to reach the sixth step of the *Williams* test, it needed to argue beyond the first step.

as the court is tasked with determining whether it agrees with the claim administrator's decision when faced with conflicting evidence and no way to test this evidence.

Unsurprisingly, Mr. Quinn's Administrative Record presents "irreconcilable" differences. Inconsistencies are present between his two treating physicians: Dr. Sailsbury, who strongly stated his belief that Mr. Quinn was permanently disabled and could not undergo an FCE, and Dr. Muratta, who said that an FCE was needed to evaluate Mr. Quinn's functionality and thus the extent of his disability. The inconsistencies are even more striking between Dr. Sailsbury and Dr. Andrade, as Dr. Andrade believed that Mr. Quinn could return to sedentary work. And pronouncing whether the administrator's decision is *de novo* wrong is even more difficult in this case because of Mr. Quinn's refusal to undergo the second round of IMEs. Because Reed based its denial of Mr. Quinn's appeal, in part, on his refusal to provide Reed with the information it needed to decide, the *de novo* analysis necessarily merges into the third step of the *Williams* test. Put differently, this court cannot say whether it agrees with Reed's ultimate decision unless it determines whether it was reasonable for Reed to request the FCE, and then affirm the denial of Mr. Quinn's benefits, in part, on his refusal to undergo the examinations.

Given the difficulties under these facts of evaluating the claim administrator's claims *de novo*, this court will, like other district courts in this circuit, proceed as if Reed's decision was wrong under the *de novo* standard. *See Herman v. Hartford Life & Accident Ins. Co.*, 2011 U.S. Dist. LEXIS 87818, at *6 (S.D. Fla. Aug. 9, 2011) (explaining that because Hartford had full discretion to review claims, the court would "proceed as if Hartford's decision was in fact wrong") (citing *Eady v. Am. Cast Iron Pipe Co.*, 203 Fed. Appx. 326, 328 (11th Cir. 2006)); *Pinto*, 2011 U.S. Dist. LEXIS 16961, at *26 (M.D. Fla. Feb. 14, 2011) ("Because Defendant in

this case has discretion under the Policy . . . the Court will proceed as if Defendant's decision, were it reviewable under the *de novo* standard, was in fact wrong.").

Because the plan vested QDS with discretion, which QDS delegated to Reed, this court will proceed under the third step of the *Williams* test and ask whether "reasonable" grounds supported Reed's decision.

## B. Reed's denial of Mr. Quinn's Benefits was supported by reasonable grounds and not arbitrary or capricious

When analyzing Reed's decision under the arbitrary and capricious standard, the court is again limited to "consideration of the material available to [the administrator] at the time it made its decision." *Oliver v. Coca Cola Co.*, 497 F.3d 1181, 1195 (11th Cir. 2007), *vacated in part on other grounds*, 506 F.3d 1316 (11th Cir. 2007) (internal quotations omitted). Even if the record presents contradictory evidence, if the evidence is close, this court should defer to Reed's decision. *See Doyle v. Liberty Life Assurance Co.*, 542 F.3d 1352, 1363 (11th Cir. 2008) ("Because the evidence is close, we cannot say, even accounting for the conflict, that [the administrator] abused its discretion in denying Doyle's benefits."). To determine whether Reed's denial of benefits was arbitrary and capricious, the court should begin with an analysis of the plan itself. *See Oliver*, 497 F.3d at 1195.

The LTD policy covering Mr. Quinn provides that he must show by objective medical documentation that he cannot hold any jobs that pays less than 60% of his base salary to qualify for LTD benefits. Further, the plan requires Mr. Quinn to seek proper care and treatment from an approved provider, and follow a recommended treatment plan. Significantly, the plan requires Mr. Quinn to report for "medical or psychological examinations from time to time at the request of [Reed], for the purpose of determining [Mr. Quinn's] condition." (A.R. at 1694).

Under the terms of this plan, the court concludes that Reed's decision to deny benefits was not arbitrary or capricious. Mr. Quinn bore the burden of providing objective medical evidence that he was disabled and was required to cooperate in examinations requested by the TPA. Although the conflicting medical evidence itself provided questionable grounds for the denial of benefits, Mr. Quinn's refusal to cooperate in the FCEs made it difficult for Reed to decide Mr. Quinn's ongoing eligibility on internal appeal because the bulk of Mr. Quinn's medical records do not speak to his functionality or ability to work. Despite the limited information Reed had in front of it when considering its review, it made efforts to obtain objective medical evidence concerning Mr. Quinn's condition. Reed therefore did not proceed arbitrarily or capriciously in denying Mr. Quinn's benefits, as further explained below.

1. *The objective medical evidence Reed relied upon provided a reasonable basis for initially denying Mr. Quinn's benefits*

Granted, the record provides conflicting evidence of Mr. Reed's functionality. While Mr. Quinn's most recent treating physician, Dr. Sailsbury, had previously stated that Mr. Quinn was unable to return to work, the independent evaluators, Dr. Andrade and Dr. Maddox, doubted whether Mr. Quinn is as limited as he claims. These doubts stemmed, in part, from similar statements by Mr. Quinn's own former treating physicians, including Dr. Winer, Dr. McCauley, and Dr. Muratta.

When Reed conducted its 2007 review, it relied on Dr. Muratta's statement and concurrence in asking Mr. Quinn to undergo an FCE. Reed also noted in November, 2007, that little objective medical evidence existed on the record; this dearth of medical documentation prompted Reed to send Mr. Quinn to Dr. Andrade and Dr. Maddox for the IMEs. Dr. Maddox, concerned about the true scope of Mr. Quinn's limitations, recommended an independent

psychiatric examination and an FCE. In response to Dr. Maddox's recommendations, Reed sent

Mr. Quinn to a psychiatrist, Dr. Bodenheimer. Mr. Quinn also underwent an FCE that he did not

complete and that provided limited information.

The result of the IMEs and the failed FCE gave Reed limited information on whether Mr.

Quinn was disabled under the terms of the plan. The TSA, created to determine if jobs were in

Mr. Quinn's area that would provide greater than 60% of his base pay at Qwest, was thus

cobbled together based on a few sentences regarding Mr. Quinn's medical history and did not

include Dr. Sailsbury's 2006 opinion that Mr. Quinn was totally unable to work. The TSA

concluded that Mr. Quinn could perform two jobs in the Anniston/Oxford area, and potentially

more with retraining; however, it also concluded that he may have a difficult time obtaining such

a job.

QDS,[6] in its July 10, 2008 letter denying Mr. Quinn's benefits, indicated that the

administrator relied on Dr. Andrade and Dr. Maddox's reports, on Dr. Bodenheimer's

examination, on the FCE, and the TSA to determine that Mr. Quinn was no longer eligible for

benefits under the plan.

Mr. Quinn argues that the evidence supporting his disability, in particular the statements

from his treating physicians, outweighs any evidence to the contrary, specifically the opinions of

Dr. Andrade and Dr. Maddox that contradict Dr. Sailsbury. The court, in reviewing this record,

only found statements from three treating physicians that Mr. Quinn could not return to work: the

statement of Dr. Porter in 2004; Dr. Sailsbury's statements in 2006 and 2008; and Dr. Roden's

statement in 2008. Although the main thrust of Dr. Roden's statement was that Reed's ongoing

---

[6] Although Qwest claims in its brief that Reed was the plan administrator, QDS sent Mr. Quinn the letter denying his benefits. According to Qwest, Reed was a third party administrator to whom QDS had delegated discretion and authority to interpret the Plan. As noted above, Mr. Quinn did not dispute this contention.

review took a "huge toll" on Mr. Quinn's health, Dr. Roden also stated that "[h]is well-documented chronic physical pain makes it impossible for him to work any meaningful job at this current time." (A.R. at 95). The court agrees with Qwest that Dr. Roden's claim that Mr. Quinn cannot return to work is unusual in light of Dr. Roden's previous statement that he was unable to speak to Mr. Quinn's functionality because his problem was mainly physical and not psychological. (A.R. at 322).

Contrary to Mr. Quinn's assertions, Dr. Andrade's opinion and Dr. Maddox's opinion are consistent with the statements from his previous treating physicians. As outlined in the statement of facts, Dr. Winer questioned whether Mr. Quinn's severe disabling complaints were out of proportion to the objective findings. Dr. Maddox, in forming his opinion that the extent of Mr. Quinn's disability was questionable and that an IME and FCE should be conducted, based his findings in part on the statements of Dr. Winer, Dr. McCauley, and Dr. Dilla, as well as his own personal examination of Mr. Quinn.[7]

In contradicting Dr. Andrade's findings, Mr. Quinn relies on a letter from Dr. Sailsbury dated August 29, 2008. In that letter, Dr. Sailsbury explains, without any elaboration, that "one of the neurosurgery evaluations has no credibility as there is no inconsistency with this patient's current state of disability." (AR 106). Despite this inconsistency between Dr. Sailsbury and the independent physicians, Reed does not need to accord extra respect to the opinions of Mr. Quinn's treating physicians in an ERISA case. *See Blankenship*, 644 F.3d at 1356 (citing *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 123 S.Ct. 1965, 1970 (2003)). The plan administrator may give different weight to these opinions without acting arbitrarily or

---

[7] Mr. Quinn asserts that Dr. Maddox never examined him. Pl.'s Br. 18 (July 22, 2010) ("To be sure, Dr. Maddox apparently never examined Mr. Quinn . . . ."). Dr. Maddox's letter, dated January 14, 2008, directly refutes this assertion. (A.R. at 770).

capriciously. *Id.* Furthermore, at the time Reed initially denied Mr. Quinn's benefits, it did not have Dr. Sailsbury's letter. Thus, to the extent that Reed based its decision on the IMEs, it did not act arbitrarily or capriciously.

Mr. Quinn also argues that Qwest acted unreasonably by ignoring the opinions of Mr. Quinn's physicians from 2002 to 2007 when it made its decision to deny benefits in 2008. According to Mr. Quinn, because the plan administrator approved Mr. Quinn for benefits before 2007, it implicitly found objective evidence to support his disability. Furthermore, Mr. Quinn alleges that Reed's sharp departure from its previous decisions to approve Mr. Quinn is because in 2007, Mr. Quinn's LTD benefits were no longer completely offset by workers' compensation and Qwest had to start paying a monthly amount.

Qwest counters in two ways. First, Qwest explains that it – not Reed – was responsible for Mr. Quinn's LTD benefits, while Reed was the plan administrator deciding Mr. Quinn's eligibility for benefits. Accordingly, Qwest argues, Reed had no motive to decide Mr. Quinn's eligibility any differently than it had in the past. Second, during Mr. Quinn's 2006 review his treating physician at the time, Dr. Sailsbury, explained to Reed that Mr. Quinn was totally disabled and refused to support an FCE. In contrast, during Mr. Quinn's 2007 review his treating physician at the time, Dr. Muratta, chose not to opine whether Mr. Quinn was unable to work, but instead indicated that an FCE was needed to answer that question.

The court agrees with Qwest on this point, and notes that simply because the plan administrator found Mr. Quinn disabled in the past does not mean it must continue to do so in the future. In 2007, Reed simply asked for objective medical documentation from Mr. Quinn's last known treating physician, as it was entitled to do so under the plan. Reed did not act arbitrarily or

capriciously in seeking objective medical documentation and relying on the latest reports on Mr.

Quinn's condition – namely those of Dr. Andrade, Dr. Maddox, Dr. Bodenheimer, as well as the

FCE.

Mr. Quinn also claims that the plan administrator acted arbitrarily and capriciously by

requiring Mr. Quinn to undergo an FCE in 2007 after Dr. Sailsbury had opined in 2006 that Mr.

Quinn should not do so. To support this contention, Mr. Quinn points out that when Dr.

Sailsbury found out that Reed wanted to schedule the FCE, he sent in a fax explaining that the

FCE would be detrimental to Mr. Quinn's health. Despite Dr. Sailsbury's concerns, Reed

proceeded to have Mr. Quinn undergo the FCE, explaining that because Dr. Muratta had treated

Mr. Quinn at the time the request for documents was made, and because Dr. Muratta had

recommended and concurred in the need for an FCE, Reed would require Mr. Quinn to undergo

the FCE.

This court disagrees with Mr. Quinn's contention that it was unreasonable to require the

FCE. Mr. Quinn has given no compelling reason why Reed could not rely on the

recommendation of one treating physician over another. Although Dr. Muratta had ceased

treating Mr. Quinn in late 2007 and Dr. Sailsbury had seen Mr. Quinn more recently, Dr. Muratta

was Mr. Quinn's primary treating physician at the time Reed sought the objective medical

records. The record also is not clear on whether Mr. Quinn's visit to the emergency room was a

result of Mr. Quinn's fulfilling Dr. Sailsbury's prophecy that the FCE would cause him severe

harm or truly a result of the FCE itself. Mr. Quinn's counsel seems unable to answer this

question, as he can only say that Mr. Quinn "apparently" visited the ER and have produced no

medical records from his visit. *See* Pl.'s Br. 25.

Mr. Quinn also argues that Qwest acted arbitrarily and capriciously when it prompted Mr. Quinn to apply for Social Security disability benefits and then ignored the decision awarding benefits when considering Mr. Quinn's ERISA claim. Mr. Quinn cites to the Supreme Court's opinion in *Glenn* for support. In *Glenn*, the Court noted that the Sixth Circuit "found questionable the fact that MetLife had encouraged Glenn to argue to the social security administration that she could do no work, received the bulk of the benefits of her success in doing so . . . and then ignored the agency's finding in concluding that Glenn could in fact do sedentary work." *See Glenn*, 554 U.S. at 118, 128 S. Ct. at 2352. The Court then explained that this conduct not only suggests procedural unreasonableness, but also justifies giving more weight to the conflict of interest. *See id.*

The Court, however, only said that this conduct *suggests* procedural unreasonableness. And as the conflict of interest is not a factor here, this court finds less reason to be concerned about Reed's treatment of the Social Security award. Certainly, this court does not find that conduct dispositive on whether Reed's decision was arbitrary or capricious. *See Ray v. Sun Life Health Ins. Co.*, 752 F. Supp. 2d 1229, 1247 (N.D. Ala. 2010) (memorandum opinion from this court explaining that "different rules apply in ERISA and Social Security cases" and finding that the plan administrator's decision to deny benefits was *de novo* right notwithstanding a contrary Social Security Administration award); *see also Ruple v. Hartford*, 340 Fed. Appx. 604, 612 (11th Cir. 2009) ("The Social Security Administration's determination that an individual is or is not disabled under its statutes and regulations does not dictate whether that same individual is disabled under the terms of an ERISA policy."); *Whatley v. CNA Ins. Cos.*, 189 F.3d 1310, 1314 n.8 (11th Cir. 1999) ("We note that the approval of disability benefits by the Social Security

Administration is not considered the requirement for disability under an ERISA-covered plan.").

A plaintiff suing under ERISA bears the burden of proving his entitlement to contractual benefits, unless the insurer claims a specific policy exclusion applies. *Horton v. Reliance Std. Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998). Here, the most recent evidence Reed acquired about Mr. Quinn, however insubstantial, reflected that he was able to perform a sedentary job. This court does not necessarily agree with Reed's opinion that Mr. Quinn does not meet the definition of "Disabled" when the TSA concluded he would have difficulty finding a suitable occupation paying 60% or more of his base bay. But under the "highly deferential" ERISA standard, and given Mr. Quinn's failure to submit sufficient objective medical evidence, neither can this court say that Reed had no reasonable grounds for its decision.

Further, this court does not review only the initial denial of Mr. Quinn's benefits. The Eleventh Circuit, when discussing the standard of review for ERISA cases, only directs the courts to review the administrator's benefits decision, and does not divide the review of this decision into a review of the initial decision and a separate review of the appeals decision. Instead, this court is directed to review the administrator's decision as a whole. And if Reed had a reasonable basis for the initial denial of Mr. Quinn's benefits, its decision to affirm that denial on appeal is even more reasonable because it gave Mr. Quinn the opportunity to provide Reed with more information upon which to base its decision. He failed to provide objective medical evidence.

   *2.   Reed's conduct on appeal continues to demonstrate that its decision was not arbitrary and capricious*

Shortly after Reed initially informed Mr. Quinn of its decision to deny his benefits, Mr. Quinn appealed. Reed gave him until mid-September to submit information supporting his appeal. He used that opportunity to submit additional medical records and two letters, one from

Dr. Sailsbury and one from Dr. Roden. Dr. Sailsbury opined in his letter that Mr. Quinn could

"never hold gainful employment," explaining that Mr. Quinn's reports of severe pain, urinary

incontinence, and weakness in his lower extremities all contributed to his disability. (A.R. at

106–07). Dr. Roden explained that Reed's "repeated attempts . . . to deny [Mr. Quinn's]

disability and stop his monthly money from coming to him," along with Reed's requiring Mr.

Quinn to attend IMEs, had "taken a huge toll on Mr. Quinn's health." (A.R. at 95).

On September 29, 2008 after Reed reviewed the information in Mr. Quinn's file on

appeal, it decided to schedule two additional IMEs in Atlanta and requested a forty-five day

extension so that information generated by the IMEs could become part of Mr. Quinn's record on

appeal. Reed scheduled the IMEs over three days in October, with the first scheduled for October

13. In the letters informing Mr. Quinn about the IMEs, Reed cited the plan provision explaining

that reporting for medical or psychological examinations from time to time was a requirement for

eligibility under the plan. Mr. Quinn, in a letter faxed on October 10, refused to attend the IMEs

without explanation.

In defense of his failure to attend the second round of IMEs, Mr. Quinn argues that

Reed's decision to schedule the IMEs two hours away from Mr. Quinn's home was unreasonable.

Reed initially tried to schedule an IME with a doctor in Huntsville recommended by Dr.

Bodenheimer. When this doctor responded that he did not perform IMEs, Reed set up

appointments with doctors in Atlanta. Mr. Quinn argues that given the size of Birmingham's

medical community, Reed had no reason to send him to Atlanta.

Mr. Quinn, however, lived in the Anniston-Oxford area, between Atlanta and

Birmingham. Because the pain management clinic Dr. Bodenheimer recommended in Huntsville

was unavailable to perform the IMEs, Reed's decision to schedule the IMEs in Atlanta was not unreasonable, even if Birmingham may have been more convenient. Furthermore, Reed did not appear to make it purposefully difficult for Mr. Quinn to attend the IMEs. Rather, Reed offered to pay all his expenses to attend the IMEs and to transport him by van, equipped to accommodate his limitations, and that would stop as often as needed per his request.

Mr. Quinn also argues that because the terms of the plan say that failure to attend examinations can only result in a suspension of benefits, Reed could no longer require Mr. Quinn to attend an IME after his benefits terminated. But as Qwest points out in reply, the obligation to attend IMEs is a basic requirement for eligibility under the plan. This court agrees with Qwest that, barring actual medical evidence that the IME would harm Mr. Quinn, Reed could properly require Mr. Quinn to attend an IME to have his benefits reinstated.

In sum, Reed's conduct during the appeal process was reasonable. Reed's initial decision denying Mr. Quinn's benefits was made on the basis of conflicting physician's opinions and insubstantial objective medical evidence. When Mr. Quinn appealed, Reed sought to obtain more objective information and accordingly scheduled the second round of IMEs. Reed's impetus in scheduling these IMEs was, in part, a recommendation from Dr. Bodenheimer, the physician who conducted the independent psychiatric examination. Dr. Bodenheimer's recommendation does not appear to be based out of a desire to conspire with Qwest to make Mr. Quinn's life more difficult. Although part of her recommendation dealt with "the concern of the long-term disability company" as to how much of Mr. Quinn's pain might be valid versus malingering, she also explained that a specialized pain management clinic could help him overcome the pain that limited him from participating in more physical activity.

29

In recommending the follow-up treatment, Dr. Bodenheimer echoed the sentiment shared by many of the doctors who had seen Mr. Quinn that Mr. Quinn's limitations appeared to exceed his actual physical condition. Accordingly, Reed had a reasonable basis for requesting additional evaluations as it was entitled to do under the plan. Reed did not act arbitrarily or capriciously in seeking additional information for appeal, and consequently did not act arbitrarily or capriciously when affirming the denial of Mr. Quinn's benefits on appeal.

### C. Qwest granted Mr. Quinn a full and fair review

Mr. Quinn also argues that Qwest acted arbitrarily and capriciously by not giving Mr. Quinn the opportunity for a full and fair review. Specifically, Mr. Quinn alleges that Qwest denied him a full and fair review by not granting his attorney, Mr. Kirby, a forty-five day extension of time to review the Administrative Record after Qwest had sent it to Mr. Kirby. Mr. Kirby, in his October 10, 2008 letter to Qwest explaining that Mr. Quinn would not undergo the second round of IMEs, also requested that Qwest send him all the requested "pertinent" documents. (A.R. at 81–82). In that same letter, Mr. Kirby also asked to be given at least another forty-five days to review the documents after receiving them, so that Mr. Quinn could "supplement his claim and appeal." (A.R. at 82).

Qwest, through Reed, responded to Mr. Kirby's request by letter dated November 18, 2008. In that letter, Qwest indicated that it had enclosed a copy of Mr. Quinn's disability claim file, but it was denying his request for additional time.  Qwest explained that because Mr. Quinn had already requested and been granted a forty-five day extension, no further extension or tolls were available. Mr. Quinn emphasizes that Qwest waited thirty-six days from Mr. Kirby's October 10, 2008 request to produce the 1,500+ page administrative record, and then affirmed its

decision to deny benefits on appeal on November 26, 2008, eight days after it sent the Administrative Record.

In support of his contention that this refusal to allow an additional extension of time denied him a full and fair review, Mr. Quinn relies on 29 C.F.R. § 2560.503-1(h)(1), which provides that an ERISA plan is required "to establish and maintain a procedure by which a claimant shall have a reasonable opportunity to appeal an adverse benefit determination . . . under which there will be a full and fair review of the claim and the adverse benefit determination." He also relies on an unpublished Sixth Circuit opinion, *Yonts v. Continental Casualty Co.*, 113 Fed. Appx. 669 (6th Cir. 2004), which held that a plan administrator acted arbitrarily and capriciously when it refused to give the claimant an extension of time to perfect his appeal and submit a letter from his psychiatrist explaining some of the claimant's behavioral abnormalities. *See id.* at 671–72.

Although Qwest's refusal to grant an extension of time seems harsh on first glance, a more in-depth review of the administrative record indicates that Qwest's conduct was not unreasonable. After Qwest initially denied Mr. Quinn's benefits, by letter dated July 10, 2008, Mr. Quinn responded by letter on July 16, 2008, requesting all medical records held by Qwest, including the IMEs. Qwest took this request to be notice of Mr. Quinn's intent to appeal. Qwest replied to Mr. Quinn in a letter dated July 22, 2008, in which it explained the appeals process to Mr. Quinn and included a summary of the information included in the Administrative Record. The letter explained: "[p]lease review the Summary of Medical [*sic*] enclosed. If there is additional information that you would like the Board to review please *contact me immediately.*" (A.R. at 110) (emphasis in original). The letter also gave Mr. Quinn guidance on the type of

31

additional information he should supply for his appeal. The letter informed him that he could request a forty-five day extension, but that he would have to do so before August 5, 2008. In another letter dated July 31, 2008, Qwest acknowledged Mr. Quinn's request for the forty-five day extension and gave him until September 17, 2008 to submit material for review. Mr. Quinn also informed Qwest by phone on July 23, 2008 that he had retained an attorney to assist in the appeal and that *no documents needed to be sent to him at that time*.

Although Qwest did not directly respond to Mr. Quinn's July 16 request for medical records, sending him only a summary of the medical records, Mr. Quinn also did not pursue the issue further or ask that the specific records in the summary be sent to him. Mr. Quinn and his lawyer used the time from July 16 to September 17 to add letters from Dr. Sailsbury and Dr. Roden, but the record does not reflect that they asked for a complete copy of the Administrative Record.  In fact, the only reason Mr. Quinn even had the additional opportunity to request all his medical records on October 10 was because *Qwest* decided to take a forty-five day extension and schedule the second round of IMEs; had it not done so, Mr. Quinn's opportunity to send additional information would have ended on September 18, 2008, and accordingly any request to review the Administrative Records for the purpose of the internal appeal would have been untimely. The record does not reflect why Mr. Quinn's counsel waited until so late into the appeals process to request all documents related Mr. Quinn's, but this court cannot say that Qwest's refusal to provide an *additional* extension of time is not unreasonable or in violation of the Department of Labor regulations requiring Qwest to give Mr. Quinn a full and fair review. To the contrary, by taking the extension of time to set up the second round of IMEs, Qwest appeared to be giving Mr. Quinn a second opportunity to provide it with the objective medical evidence

necessary for Qwest to make an informed decision, and allowing him more opportunity for a full and fair review than if it had just made a decision after the original September 18 deadline.

### D.   *No conflict of interest exists*

Mr. Quinn states in his initial brief that Qwest had a significant change of attitude towards Mr. Quinn's LTD benefits once Mr. Quinn's LTD benefits were no longer completely offset by his Social Security benefits and workers' compensation. Although Mr. Quinn does not directly allege a conflict of interest – in fact, stating that the issue of a conflict of interest is "irrelevant," *see* Pl. Br. at 20 – his insinuation that Qwest's financial incentives demonstrate "procedural unreasonableness" in the decision-making process is essentially an allegation of a conflict of interest.

In reply to Mr. Quinn's contention, Qwest asserts that it was self-insured for up to $1,000,000.00 per work-related injury, and was therefore responsible for costs related to Mr. Quinn's workers' compensation claim and later his LTD benefits. Qwest thus asserts that Reed did not pay the LTD benefits, that Qwest was not involved in denying the claim, and that Reed obtained no financial benefit from denying the claim.

Mr. Quinn does not dispute any of Qwest's assertions, and significantly, never once specifically asserted a conflict of interested existed in either his initial or reply brief. Because facts not denied are deemed admitted, this court will find that Mr. Quinn dropped any preliminary plans to assert a conflict. *See* N.D. Ala. Uniform Initial Order, Appendix II ("*All material facts set forth in the statement required of the moving party will be deemed to be admitted for summary judgment purposes unless controverted by the response of the party opposing summary judgment.*") (emphasis in original). In any event, Mr. Quinn offered no

evidence that a conflict of interest exists. Thus, the court's review ends with a finding that Qwest's decision, regardless of whether the court agrees with it under a *de novo* review, was not arbitrary or capricious.

## IV. Conclusion

For the reasons stated above, the court will DENY Mr. Quinn's motion for judgment as a matter of law and DISMISS this case with prejudice.  The court will contemporaneously enter an order to that effect.

DONE and ORDERED this 30th day of September, 2011.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE